IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| DENISE ROBINSON,<br><br>        Plaintiff,<br><br>    vs.<br><br>TAD MECHAM, in her official and individual capacities and JARED HAMMON, in his official and individual capacities,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER AFFIRMING REPORT & RECOMMENDATION**<br><br>Case No. 2:15-cv-738<br><br>Judge Clark Waddoups |

This is a civil rights action alleging violations of the First, Fourth, and Fourteenth Amendments arising from an incident at the Kanab Port of Entry in July 2015. Plaintiff seeks "monetary damages and injunctive relief" under 42 U.S.C. § 1983. Defendants filed a motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6). (Dkt. No. 18.) The matter was referred to United States Magistrate Judge Brooke Wells under 28 U.S.C. § 636(b)(1)(B). On July 29, 2016, Magistrate Judge Wells issued a Report and Recommendation, recommending that this court dismiss plaintiff's complaint because the claims are "not plausible" based on the surveillance video that captured the events at issue, and because plaintiff's complaint failed to state a claim upon which relief can be granted. (R & R, Dkt. No. 32.) Plaintiff timely objected to the Report and Recommendation as provided by Federal Rules of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1)(C). This court has reviewed the Report and Recommendation and plaintiff's objections de novo. Being fully advised, the court now accepts the recommendation and GRANTS defendants' motion, but for the reasons stated below.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[M]ere labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (internal punctuation omitted). Furthermore, Federal Rule of Civil Procedure 12(d) states that "[i]f, on a motion under Rule 12(b)(6) matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Both parties submitted the Kanab Port of Entry surveillance videos that captured the event at issue, and plaintiff submitted additional law enforcement dispatch audio files as well as still photographs. In addition to both parties being on notice, based on their submissions and arguments, that this matter may be converted to a motion for summary judgment, on December 14, 2016 the court notified the parties that it intended to convert the motion to dismiss into a motion for summary judgment and invited objections by a set deadline. Neither party objected to the court's notice. Accordingly, the court will treat defendants' motion as a motion for summary judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Because the video recording and still photos "tell[ ] quite a different story" than

2

many of the facts in plaintiff's complaint, the court also views the facts in the light depicted by the actual recordings and photos. *Id.* at 379-80 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

**FACTUAL HISTORY AND FINDINGS**

The facts upon which the parties agree are cited below. (Mot. to Dismiss p. 2-6, Opp'n Memo p. 3; Dkt. Nos. 18, 19.) Where the parties do not agree, the court cites the facts directly from the plaintiff's copy of the surveillance video and identifies them as such, or where they are consistent with the surveillance video, from plaintiff's Opposition Memo.

1.  On or about July 1, 2015 at about 4:06 p.m. plaintiff Denise Robinson was traveling with her husband through Kanab, Utah in a tractor trailer combination. They were transporting watermelons to a retailer in Salt Lake City.

2.  As they approached the Kanab Port of Entry, a flashing light and sign ordered plaintiff and her husband to exit the highway and enter the weigh station.

3.  After driving across the scale, a Port of Entry agent ordered that the truck stop and the driver enter the building with all paperwork. Plaintiff accompanied her husband into the building.

4.  A surveillance video at the Kanab Port of Entry captured and recorded the events at issue. At plaintiff's request, her copy of the surveillance video was viewed by the court.

5.   As the surveillance video begins, defendant Tad Mecham can be seen sitting at one of the desks in the Port of Entry, looking out the window at vehicles on the scales, and talking on a cellphone.

6.   Plaintiff and her husband walked into the Port of Entry office and Mr. Robinson laid a red folder on the counter. Mecham stood and began looking at Mr. Robinson's paperwork while still on her cellphone. (Video 4:18:24-4:18-44.)

7.   Mecham stated to the caller something like, "I've got to go, I've got a driver here." (Video at 14:18.)

8.   Mecham then finished her cell phone call. She indicated to Mr. Robinson that he was 1000 pounds overweight on his rig.

9.   Mecham and Mr. Robinson continued to discuss the total weight of his rig versus the weight of his axels. During this portion of the conversation, Mr. Robinson remained calm, although he briefly used profanity and expressed surprise or incredulity that he may be ticketed for having an overweight axel when the gross weight of his rig was less than the limit, and because no fuel allowance was given. For her part, Mecham remained calm during this portion of the conversation as well, indicating that axel weights, not just gross weights, are enforced, and that Utah is a "zero tolerance state." (Video at 14:18-14:20.)

10. Mr. Robinson stated that in his 15 year driving career, he had never been issued a citation for such a violation. He then flipped his driver's license or some other identification card onto the counter in front of Mecham. (Video at 14:20.)

11. Mecham stated that she had been at the Port of Entry for 28 years, then turned away from the front counter with the folder containing the Robinsons' paperwork and placed it on a side desk, saying, "and I can tell you we never give an allowance." (*Id.*)

12. At this point, the verbal exchange between Mr. Robinson and Mecham became more heated. Mr. Robinson swore, claimed that he had been given an allowance multiple times, and began to raise his voice at Mecham. Mecham then turned back toward Mr. Robinson, began to raise her voice, and stated, "you are just talking your way into more tickets buddy." (Video at 14:20.)

13. In response, Mr. Robinson's voice became loud and aggressive. He told Mecham, "I don't give a fuck what you do" and began to gesticulate while loudly stating, "do what you want to do, give me a ticket for whatever you want!" (Video at 14:20:33.)

14. At this point Mrs. Robinson can be seen picking up her cell phone. Neither Mecham nor Mr. Robinson appear to notice her. Mecham, also in a loud voice, gestured at Mr. Robinson and in response to his loud voice and profanity told him, "Ok, go outside right now." (Video at 14:20:35.)

15. Continuing to speak loudly and aggressively, Mr. Robinson retorted, "I'm not going anywhere." (Video at 14:20:35.)

16. Mecham turned away and while walking away from the desk stated, "Fine, I'll just get an officer up here." (Video at 14:20:38.)  Mr. Robinson responded by approaching the desk more closely and retorting loudly, "Fine, get you an officer!" Mecham stepped out of camera range and can be heard in the background asking someone for assistance. Meanwhile, Mrs. Robinson can be seen manipulating the screen of her phone, and then began to hold it up in recording

position while Mr. Robinson loudly protested that Mecham can, "cite me for whatever you want" and, "don't forget, I live here" and, "I will be filing a § 1983 civil lawsuit against you." (Video at 14:20:38-14:20:53.)

17. While Mecham, out of camera range, asked what a § 1983 civil lawsuit was, Jared Hammon can be seen walking toward the front entryway with his finger pointing toward the front door. Mr. Robinson stated, "I ain't going anywhere, I'm doing an inspection!" Hammon passed the counter and began to approach Mr. Robinson from the side, with his right arm at waist level appearing to attempt to guide Mr. Robinson toward the door. Hammon's left hand was pointed toward the door. It is unclear whether Hammon actually made contact with Mr. Robinson or whether his hand was simply held near Mr. Robinson at about waist level. If it was a touch, it was light and brief at best. (Video at 14:20:53-14:20-57.)

18. Mr. Robinson loudly shouted "Don't touch me!" and backed away from Hammon. He then turned toward Hammon, who remained at the counter and was still pointing at the door. Hammon asked in a calm voice for Mr. Robinson to go outside, while Mrs. Robinson lifted her phone higher and was more obviously seen apparently recording with it.[1] (Video at 14:20:57-14:20:59.)

19. Hammon approached Mr. Robinson without touching him in what appears to be another attempt to guide him closer to the door, while pointing again toward the door. Hammon asked Robinson in ordinary volume to go outside. Mr. Robinson told Hammon he is not an officer of the law and Hammon responded, "Yes I am," and told him to go outside. Mr. Robinson

---

[1] None of the parties submitted any recording purportedly made on Mrs. Robinson's cell phone. Whether a recording was actually made is not clear from the evidence. The recordings submitted and relied upon by all parties were from cameras in the Port of Entry office.

continued to loudly state, "Do not touch me!" Robinson asked, "Am I under arrest?" Hammon responded, "No." Mr. Robinson stated, "Then get out of my face!" Mecham can be heard in the background saying, "You get out of my building!" while Hammon responded, "No." Hammon again tried to guide Mr. Robinson toward the door with a hand near Mr. Robinson's waist. (Video at 14:20:59-14:21:07.)

20. Mr. Robinson appeared to avoid any physical contact with Hammon by backing up, but did continue to yell, "Don't touch me!" "Do not touch me!" "I will defend myself!" As he retreated, Hammon followed, slowly ushering Mr. Robinson toward the door without contacting him physically. Hammon continued to ask Mr. Robinson to leave, and at this point, without appearing to touch Mr. Robinson, reached behind him and to his side and opened the door. Mrs. Robinson appears to continue to record the encounter with her phone. (Video at 14:21:07-14:21:13.)

21. While Hammon continued to gesture toward the open front door and ask Mr. Robinson to leave, and Mr. Robinson continued to loudly state that he would not leave, Mecham can be seen walking quickly toward the front desk. Mecham reached over the desk and with her right hand took a swipe at Mrs. Robinson's phone while Mrs. Robinson moved it out of her reach. There did not appear to be any physical contact during this first swipe at the phone. (Video at 14:21:13-14:21:14.)  Mecham later made statements supporting that she was upset that Mrs. Robinson appeared to be recording the incident.

22. Mr. Robinson turned back toward the desk and began approaching his wife while Hammon finished opening the door. Mecham quickly reached back with her right hand in another apparent attempt to take Mrs. Robinson's phone while Mrs. Robinson shifted position

and retreated further. (Video at 14:21:13-14:21:14.)  It does not appear that Mecham's right hand made contact with the phone, but it appeared to make brief, flat contact with Mrs. Robinson's left biceps. Due to Mrs. Robinson's retreat, Mecham's hand while flexed in a holding or grabbing position appeared to make no further contact with Mrs. Robinson. Hammon is seen returning to the front counter area. (Video at 14:21-14:21-15.)

23. Still photos provided by Mrs. Robinson do not verify any injury to Mrs. Robinson's left arm. (Ex. B, Dkt. No. 20.)

24. The parties' voices became raised during this scuffle, with Mecham loudly demanding that the Robinsons "get out of here!" and pointing with both hands toward the door. Meanwhile, Mr. Robinson yelled back at Mecham and Mrs. Robinson knocked her own, separate, paperwork off the counter. Mrs. Robinson bent down and picked up her paperwork. Mrs. Robinson's cell phone remained in her hand the entire time. (Video at 14:21:15-14:21-20.)

25. Mecham then retreated. Mr. Robinson declared, "Call the police."

26. Tad Mecham responded, "I am calling the police."

27. Mr. Robinson told Hammon, "Get the fuck away from me."

28. While Mrs. Robinson attempted to make a phone call, her husband placed both of his hands on her shoulders and turned around and steered her outside. They left the port of entry office without the red folder initially brought in by Mr. Robinson.

29. After the Robinsons exited, Hammon asked Mecham, "Did you call the police?"

30. Mecham and Hammon are outside of video range for several minutes. Mecham then returned to sit at her desk, picked up the red folder, and stated "I've got his driver's license and medical card," and appeared to begin work at her computer. (Video at 14:23:30-14:23:34.)

8

31. Mecham stood up and exited video range for several more minutes, and then returned with the red folder and sat down and appeared to begin working on her computer again. While doing so, she was apparently talking with Hammon, who was out of video range, about the incident. She continued to work on the Robinsons' paperwork for several more minutes. (Video at 14:23:34-14:29:34; 14:31:15-14:32:50.)

32. Two deputies then entered the building. Hammon and Mecham spoke to them about the incident for approximately ten minutes. (Video at 14:32:50-14:42.)

33. Mecham then asked the deputies whether she should finish filling out the citation. Upon being told she should, she sat back down at the computer and appeared to continue to work on the Robinsons' paperwork. (Video at 14:42:07.)

34. Mecham then worked on the Robinsons' paperwork steadily, while the deputies remained in the front waiting area, until the video recording ended. During that time, she was briefly interrupted for about thirty seconds for an interaction with a woman who entered and then exited the building. (Video at 14:42:07-14:52:59.)

35. Utah Highway Patrol Trooper Nick Berry eventually arrived and delivered the Utah Department of Transportation citation and all property back to the Robinsons, who eventually proceeded on their way. Mrs. Robinson's complaint did not allege the total duration of the stop.

## DISCUSSION

Defendants argue that they are entitled to qualified immunity to shield them from liability, if any, for the events at issue here. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v.*

*Callahan*, 129 S. Ct. 808, 815 (2009) (internal quotations omitted). Two important interests are balanced by the doctrine of qualified immunity: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Furthermore, qualified immunity shields an official who "reasonably misapprehends the law governing the circumstances she confronted," even if the decision is constitutionally deficient. *Brosseau v. Haugen*, 543 U.S. 194 (2004). While both parties agree that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001), it should be denied "only if, on an objective basis, it is obvious that no reasonably competent [official] would have concluded that the actions were constitutional." *Ball v. Div. of Child & Family Servs.*, 1:11-cv-00028-DS, 2012 U.S. Dist. LEXIS 83125 * 9 (D. Utah June 14, 2012). But, "if [officials] of reasonable competence could disagree [about the lawfulness of the challenged conduct], then [qualified] immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants having raised a qualified immunity defense, plaintiff now bears the "heavy two-part burden" of proving "(1) that defendants violated a constitutional or statutory right, and (2) the right was clearly established at the time of the defendants' unlawful conduct." *Mecham v. Fraizer*, 500 F.3d 1200, 1204 (10th Cir. 2007) (internal punctuation omitted). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001).

To begin with, both parties acknowledge that defendants are not police officers, but rather civilian port of entry agents tasked with carrying out the duties specified in Utah's

Department of Transportation Code at U.C.A. § 72-9-501 et seq. While port of entry agents who are not otherwise "peace officer[s] or special function officer[s]" do not have "actual arrest powers" as defined by U.C.A. § 77-7-18, they are authorized to stop, check, inspect, or test drivers, vehicles, and vehicle loads for compliance with state and federal law and to impose a number of consequences for violations, including issuing citations, administering tests, placing a driver out-of-service, etc. U.C.A. § 72-9-501(2)(b)-(3). Because there is scant case law regarding port of entry agents in like circumstances, and the court finds that their functions are analogous to those of police officers engaging in an authorized traffic stop, the court evaluates the constitutionality of defendants' actions in light of case law applicable to police officers. First, the court evaluates plaintiff's claims that defendants violated her First Amendment constitutional right to video record the events in question and concludes that plaintiff failed to make such a showing. Second, the court evaluates plaintiff's Fourth and/or Fourteenth Amendment claims for unlawful seizure and excessive force and concludes that plaintiff has not demonstrated a constitutional violation in either case. Finally, the court evaluates plaintiff's Failure to Intervene claims and concludes that because no constitutional violation has been shown, this claim also fails as a matter of law.

### 1. First Amendment Rights

Mrs. Robinson's claim that defendants violated her First Amendment speech rights to record the port of entry officials fails as a matter of law. After reviewing a number of cases from other circuits and district courts, the Tenth Circuit declined to conclude that that "there is a First Amendment right to record law enforcement officers in public." *Mocek v. City of Albuquerque*, 813 F.3d 912, 931 (10th Cir. 2015). Because this court has found that these government port of

entry agents carry out functions equivalent to law enforcement officers engaged in a lawful traffic stop in a public place, the Tenth Circuit's conclusion applies and bars plaintiff's claim that her First Amendment constitutional right was violated. Thus, even though the court accepts the facts in the light most favorable to Mrs. Robinson, in the absence of Tenth Circuit law suggesting that Mrs. Robinson had a First Amendment constitutional right to video record the port of entry agents, there can be no claim that such a right has been violated.

Moreover, the court agrees with defendants that even if Mrs. Robinson had a constitutional right to video record the port of entry agents, the facts do not support that she was denied that right. Viewed in the light most favorable to Mrs. Robinson, the facts show that she apparently recorded the encounter without interference at least until Mecham attempted to take away her phone, and perhaps thereafter until Mrs. Robinson started making a phone call instead, as Mrs. Robinson agrees that neither Mecham nor Hammon ever took away her phone, nor was it searched or destroyed, as were the recording devices in *Mocek*.[2]  If the Tenth Circuit did not find a violation of a First Amendment constitutional right in *Mocek* when officers took defendant's phone away, arrested him, and deleted the video recordings, Mrs. Robinson fails as a matter of law to show a violation when her phone was never taken away from her, she was not arrested, and her video recordings were not confiscated or deleted.

---

[2] *Mocek* involved a defendant who began filming Transportation Security Administration (TSA) agents at the Albuquerque airport security checkpoint when his failure to produce identification led agents to begin security procedures defendant thought were atypical. He was eventually arrested, and "police confiscated the camera and deleted the video recordings." 813 F.3d at 921. The Tenth Circuit did not reach a conclusion on the existence of a First Amendment right to record, and held that because the law was not clearly established, officers reasonably believed they had probable cause for his arrest and were entitled to qualified immunity on the First Amendment claim. *Id.* at 932.

2. **Fourth Amendment Rights**

Mrs. Robinson alleges unlawful seizure and excessive force under the Fourth and Fourteenth Amendments. At the outset, the court's analysis is guided by the Supreme Court in *County of Sacramento v. Lewis*, 523 U.S. 833 (1997), which states that "where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process [under the Fourteenth Amendment], must be the guide for analyzing these claims." *Id.* at 842 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Thus, the court looks first at the Fourth Amendment, moving only to the Fourteenth Amendment when the Fourth Amendment is not implicated.

A. **Unlawful Seizure**

"To state a claim under the Fourth Amendment, plaintiffs must show both that a seizure occurred and that the seizure was unreasonable." *Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000). Mrs. Robinson alleges she was seized twice:  first, when Mecham attempted to take her phone and/or held onto or grabbed her arm, and second, when she was unable to leave the port of entry because the agents still had her husband's paperwork. The court will address each allegation separately.

i.   *Telephone incident*

A seizure under the Fourth Amendment "requires an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). Viewing the surveillance video in the light most favorable to Mrs. Robinson, the court concludes that no reasonable juror could find that Mecham acquired physical control over Mrs. Robinson or her phone. Assuming that

contact occurred, it was fleeting and brief and does not amount to control. Thus, no Fourth

Amendment seizure occurred, and the court therefore treats this claim as a Fourteenth

Amendment substantive due process claim.

"[T]he substantive component of the Due Process Clause is violated by executive action

only when it can properly be characterized as arbitrary, or conscience shocking, in a

constitutional sense." *County of Sacramento*, 523 U.S. at 847 (internal punctuation omitted). "To

satisfy this standard, a plaintiff must do more than show that the government actor intentionally

or recklessly caused injury to the plaintiff by abusing or misusing government power. Rather, the

plaintiff must show a high level of outrageousness." *Clark v. Edmunds*, 513 F.3d 1219, 1222

(10th Cir. 2008) (internal quotations and citations omitted). Plaintiff has not made this showing.

Even viewed in the light most favorable to Mrs. Robinson, the surveillance video and still photos

show no evidence of injury to Mrs. Robinson. Furthermore, while Mecham's conduct in reaching

for Mrs. Robinson's phone may have been unpleasant or overly reactive, it does not shock the

conscience necessary for a due process violation in the circumstances of this encounter. "[W]hen

unforeseen circumstances demand an [official's] instant judgment, even precipitate recklessness

fails to inch close enough to harmful purpose to spark the shock that implicates the large

concerns of the governors and the governed." *Clark*, 513 F.3d at 1222.

> ii.     *Freedom to Leave*

"A traffic stop is a seizure within the meaning of the Fourth Amendment." *United States*

*v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001). Furthermore, the Tenth Circuit has rejected the

idea that "a vehicular stop detains for Fourth Amendment purposes *only* the driver simply

because the passenger may be free to depart." *United States v. Erwin*, 875 F.2d 268, 270 (10th

Cir. 1989). The court has found here that a port of entry stop is analogous to a lawful traffic stop, thus the court must conclude that the port of entry stop constituted a seizure of Mrs. Robinson. As a result, "any liability must turn on an application of the reasonableness standard governing searches and seizures, not the due process standard of liability for constitutionally arbitrary executive action." *County of Sacramento*, 523 U.S. at 842-43.

Mrs. Robinson does not challenge the lawfulness of the initial stop when she and her husband's vehicle was directed to the scales to be weighed at the port of entry. Instead, she alleges that the duration of the stop was unreasonable. By analogy to investigative encounters by police officers, such a stop "must be temporary, lasting no longer than is necessary to effectuate the purpose of the stop, which, in the case of a traffic stop, is to address the traffic violation that warranted the stop in the first place." *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015). The Supreme Court, however, "has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests . . . [and] [t]hese categories are not static and may escalate from one to another." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). There was no arrest here. But in addition to an investigative port of entry stop, the court finds there was also a consensual encounter. A consensual encounter is not a seizure under the Fourth Amendment. *Id.* Furthermore, "a traffic stop may be expanded beyond its initial purpose if the traffic stop has become a consensual encounter." *Moore*, 795 F.3d at 1229.

Viewing the facts in light of plaintiff's surveillance video, the initial stop to investigate the Robinsons' overweight trailer was brief. By the time the Robinsons left the foyer of the port of entry, both parties had called for police to address their respective complaints about the other. The audio recordings support this finding. For this portion of the stop, then, the encounter

converted or "escalated" from an investigative stop to a consensual stop because both parties intended the delay to have their respective concerns heard by police officers. Mrs. Robinson's complaint does not allege the total duration of the stop, although in subsequent pleadings she indicates the duration amounted to two hours. The problem is that Mrs. Robinson made no allegations about how much of this time involved defendants' resolution of the overweight vehicle citation and how much involved both parties' consensual communications with police officers called by each of them as a result of the unpleasant encounter. Furthermore, other than a ten minute discussion with arriving police officers, the surveillance video shows Mecham working on and/or processing the Robinsons' paperwork steadily from the time the Robinsons left the port of entry foyer until the recording ends. There is no allegation that the Robinsons asked for their paperwork and citation earlier so as to be on their way. Both parties agree that after Officer Nick Barry arrived, the citation and paperwork were delivered to the Robinsons promptly and they left the port of entry. Thus, from an objectively reasonable standpoint, it does not appear that the port of entry agents delayed the investigative stop any longer than necessary to resolve the overweight vehicle citation. The facts alleged and the evidence provided support only that the investigative portion of the stop was not unreasonable and that the remaining duration was consensual, which authorized the expansion of time for the investigative stop.

### B. Excessive Force

Because this court has determined that Mrs. Robinson's claim regarding Mecham's attempt to take her phone and/or hold onto or grab her arm is not a seizure, Mrs. Robinson does not have a claim under the Fourth Amendment for "excessive use of force in effectuating that seizure." *Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015). Therefore, the court treats this

claim as a Fourteenth Amendment substantive due process claim, and the same standard applies to the excessive force claim as was applied to the unlawful seizure claim. Under that standard, Mrs. Robinson has not shown that Mecham's conduct "shocks the conscience." *Id.* "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 575 (internal punctuation omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates [the Constitution]." *Clark v. Summit County Sheriff*, 508 F. Supp. 2d 929 (D. Utah 2007). Described objectively upon viewing the surveillance video, Mecham's conduct consisted of a non-contact swipe at a phone, a brief flat contact with Mrs. Robinson's left biceps, and yelling. This conduct does not even rise to the level of a push or a shove. Under the circumstances of this encounter, the court does not believe that any reasonable juror could find that Mecham used excessive force or was deliberately indifferent to any harm toward Mrs. Robinson.

### 3. Failure to Intervene

Mrs. Robinson's claim that Hammon failed to intervene in the violation of her constitutional rights fails because, for the reasons stated above, she has not successfully shown that there was an unlawful seizure or excessive use of force. "In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Jones*, 809 F.3d at 576. Without either an unlawful seizure or an excessive use of force, Mrs. Robinson's failure to intervene claim cannot survive.

### CONCLUSION

Having established no constitutional violation, Mrs. Robinson cannot sustain the first of the two-part showing required to rebut defendants' assertion of qualified immunity. Defendants

are entitled to summary judgment based upon their qualified immunity defense. The court

GRANTS defendants' motion (Dkt. No. 18) and directs the Clerk of Court to enter judgment in

favor of defendants and close the case.

DATED this 23rd day of January, 2017.

BY THE COURT:

Clark Waddoups
United States District Court Judge